UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:20-cv-22901-DPG

**SECURITIES AND EXCHANGE COMMISSION,**

       **Plaintiff,**

v.

**THUNDERBIRD POWER CORP.,
RICHARD HINDS, ANTHONY GOLDSTEIN,
and JOHN ALEXANDER VAN AREM,**

       **Defendants.**

_____/

**PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT OF PERMANENT INJUNCTION
AND OTHER RELIEF AGAINST DEFENDANT THUNDERBIRD POWER CORP.**

## I.  Introduction

Plaintiff Securities and Exchange Commission, pursuant to Federal Rule of Civil Procedure 55(b)(2), moves the Court for an order: (a) entering a default judgment imposing a permanent injunction against Defendant Thunderbird Power Corp. ("Thunderbird" or "the Company"); and (b) giving the Commission 90 days to file a motion seeking specific amounts of disgorgement, prejudgment interest on disgorgement, and a civil penalty against Thunderbird.  As described below, the Commission has met the procedural requirements for entry of a default judgment, and the allegations of the Complaint and the additional evidence submitted with this motion warrant a finding that Thunderbird committed the violations of the federal securities laws alleged in the Complaint.  The facts and the law further support the entry of a permanent injunction against future violations of those statutes and rules.

## II.  Procedural Background

The Commission filed its Complaint against Thunderbird and three individual defendants

on July 14, 2020, alleging they violated Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") (registration provisions), Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rule 10b-5 (anti-fraud provisions), and Section 15(a) of the Exchange Act (broker-dealer registration provisions) (DE 1). Thunderbird filed its Answer and Affirmative Defenses on October 5, 2020 (DE 21), an Amended Answer and Affirmative Defenses on October 29, 2020 (DE 26), and a Second Amended Answer on April 8, 2021 (DE 50).

Discovery ensued, and Thunderbird refused to appear for a corporate deposition on three separate occasions after first agreeing to do so. DE 58, 60, 61, 68, and 71. On the third occasion, Thunderbird's counsel moved to withdraw, claiming his client had terminated him because of a conflict of interest and could not pay its bills (DE 58). After briefing, the Magistrate granted the motion to withdraw on June 21, 2021 (DE 71). In the Order, the Magistrate gave Thunderbird 20 days to find new counsel, and warned of the consequences if no new counsel appeared:

> Thunderbird has 20 days from the date of this Order to have new counsel enter an appearance on its behalf. As a corporation, Thunderbird is an artificial entity that can only act though agents; it cannot appear pro se and must be represented by counsel. See Palazzo v. Gulf Oil Corp., 764 F.2d 1381, 1385 (11th Cir. 1985). Failure to have new counsel appear by the prescribed date may subject Thunderbird to the entry of default.

DE 71 at 1-2.

The 20 days ran on Monday, July 12, 2021, and no new counsel appeared or contacted the Commission. As a result, the Commission filed a motion asking the Court to direct the Clerk to enter a default against Thunderbird (DE 72). The Court granted the motion (DE 73), and on July 16, 2021, the Clerk entered the default (DE 75).

### III  Memorandum Of Law

#### *A.  The Commission Is Entitled To A Default Judgment*

Upon the Clerk's entry of a default against Thunderbird, the allegations of the

Commission's Complaint were deemed admitted against the Company, and the Commission's entitlement to relief was established. *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987); *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999). When a party fails to defend an action and a default has been entered, the propriety of the relief sought is deemed established. *Buchanan*, 820 F. 2d at 360; *Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983); *Miller*, 75 F. Supp. 2d at 1346. Thus, the following allegations of the Complaint are deemed admitted against Thunderbird:

<u>B. The Commission's Complaint</u>

1. Thunderbird's Offering

From no later than August 2016 through at least October 2018, Thunderbird and co-Defendants Richard Hinds, Anthony Goldstein, and John Alexander van Arem defrauded at least 60 investors out of more than $1.9 million in the unregistered offer and sale of Thunderbird stock. Favorably comparing Thunderbird shares to Amazon, Facebook and Google stock in their nascent stages in a YouTube video, Thunderbird, Hinds and Goldstein in that video and elsewhere misrepresented the technology Thunderbird was developing. Additionally, the Defendants misappropriated investor funds. Complaint, DE 1, at ¶1.

Thunderbird claimed to be developing an energy-efficient wind turbine technology known as the PowerStack for use on power-producing wind farms. Hinds and Goldstein were officers in the Company, while van Arem was a consultant who helped set up, supervise, and pay a nationwide network of sales agents. *Id.* at ¶2. All four Defendants in various capacities were responsible for numerous false and misleading statements about the Company and its technology while offering and selling shares in the Company. Among other things, the Defendants made or contributed to material misrepresentations and omissions in press releases, marketing materials, offering

documents, and the YouTube video about: (1) the status of the PowerStack's development and its purported validation by a nationally-known scientific development firm; and (2) use of investor proceeds. In addition, Hinds, van Arem, and Goldstein misappropriated more than 40 percent of investor funds raised to enrich themselves and pay sales agents. *Id.* at ¶3. The shares Thunderbird offered and sold were not registered with the Commission. *Id.* at ¶5.

Starting no later than July 2016, Hinds coordinated with Goldstein and van Arem to solicit investors and raise money from the sale of Thunderbird stock. *Id.* at ¶12. They consulted with each other in the summer and fall of 2016, often by email, to develop a private placement memorandum ("PPM"). The PPM described the PowerStack technology and detailed Thunderbird's efforts to raise millions of dollars by offering to sell restricted shares of common stock in the company at $3 per share. The PPM listed Hinds as the Company's Chief Executive Officer as well as a director, Goldstein as the Company's President and Chairman of the Board, and van Arem as a consultant. *Id.* at ¶13.

According to the PPM, Thunderbird was only offering shares "not registered under the Securities Act of 1933" under Regulation D, Rule 506(c) to U.S. residents who were "accredited investors." Accredited investors are those who meet certain financial, income, or sophistication levels. Under Rule 506(c), to be exempt from registering the offering, a company may only sell shares to accredited investors and must make reasonable efforts to ensure its investors are accredited. *Id.* at ¶14.

Along with developing the PPM, Goldstein and van Arem, with Hinds' knowledge, hired sales agents around the country to solicit investors. In addition, Goldstein, van Arem, and the sales agents cold-called investors, told them about the investment opportunity in Thunderbird, and provided them with documents such as the PPM, a business plan, and a subscription agreement.

*Id.* at ¶16. Interested investors signed and mailed their subscription agreements to the Company, and sent their money by wire or check to a Thunderbird bank account. *Id.* at ¶17.

The subscription agreements required investors to sign a form attesting that they were accredited, which included checking off boxes about their income, wealth, and assets, among other information, to show how they were accredited. However, several investors either did not indicate on their subscription agreements whether they were accredited or indicated they were not. The Defendants did nothing to verify whether any of the investors were accredited.[1] Goldstein signed the subscription agreements on behalf of Thunderbird. Investors then received stock certificates for Thunderbird shares, signed by both Hinds as CEO and Goldstein as President. *Id.* at ¶¶17-18.

Thunderbird used about one third of the investor funds it raised to pay commissions to van Arem and other sales agents. The commissions to van Arem were part of an agreement between him and Thunderbird, which Goldstein and Hinds knew about, in which van Arem was to receive 50 percent of all investor proceeds for his services. *Id.* at ¶19.

2.  Material Misrepresentations And Omissions

Through press releases, the YouTube video, Thunderbird's website, and other on-line resources, including Facebook and LinkedIn, Thunderbird, Hinds, and Goldstein misrepresented the development of the PowerStack Technology and its alleged validation by a multi-national scientific development firm. For example, in press releases dated November 29, 2017 and June 14, 2018, Thunderbird claimed that technology development company Siemens had "confirmed that the PowerStack extracts more kinetic energy from wind than any other wind turbine technology on the market." *Id.* at ¶21. The 2018 press release went on to state that:

The tasks that Siemens have performed are considered analogous to physical wind tunnel

---

[1] Discovery confirmed that several investors were not accredited and Thunderbird did nothing to determine whether they were. *See, e.g.,* Declaration of Ronald Strong, attached as Exhibit 1; Declaration of Quentin Stephen, attached as Exhibit 2.

5

> testing and the results are considered solid. This confirms that the PowerStack wind turbine is the most efficient and cost efficient wind turbine technology on the market and will produce electricity at a tiny fraction of the cost of any other method, renewable or fossil.

Thunderbird posted both press releases on its website, and the 2017 press release was reposted on Facebook. Furthermore, the Company included the statements about Siemens' work in emails to shareholders, some of whom later invested additional amounts. *Id.* at ¶23.

The YouTube video, disseminated to prospective investors, contained similar claims about Siemens' work and the status of the PowerStack development, as well as other misleading statements. After mentioning the returns realized by early investors in Google, Facebook, and Amazon, the video claimed the "PowerStack wind turbine can produce electricity for a tiny fraction of the cost of ANY other technology, fossil or renewable." *Id.* at ¶¶24-25. The video also falsely claimed that "work recently performed on the PowerStack by multi-national giant Siemens has validated that the PowerStack is far and away the most efficient wind turbine technology in the world." *Id.* at ¶26.

Both the press releases and the YouTube video were blatantly false. Siemens had not confirmed the efficiency of the PowerStack or its production ability. Siemens only evaluated a conceptual model of the PowerStack, based on data provided by Thunderbird, and its work only involved computer simulations. Siemens did not test or evaluate any wind turbine in physical form and could not have because Thunderbird did not even begin to build an actual wind turbine until November 2018 at the earliest – well after the statements in the press releases and the YouTube video. In addition, at no time did Siemens ever compare the PowerStack with any other technology or design existing in the wind turbine industry. *Id.* at ¶¶27-28. *See also* Declaration of Ali Rozati, attached as Exhibit 3.

The statements in the YouTube video that the PowerStack wind turbine could "produce

6

electricity for a tiny fraction of the cost of ANY other technology, fossil or renewable," that it "is far and away the most efficient wind turbine technology in the world," and that the PowerStack is "easy to manufacture, ship and install and requires virtually no maintenance" were likewise false. Without even a prototype wind turbine constructed and without any physical testing on an actual product, there was no basis in fact for Thunderbird to make any claims about the operation, production cost, and efficiency of any wind turbine. *Id.* at ¶30; Declaration of Peter Jenkins, attached as Exhibit 4.

Thunderbird and its officers in fact acknowledged that their public statements about Siemens' work were false and misleading on the Company website in November 2018 (after investor solicitations ceased) when they wrote that the Company had only provided Siemens with data and was not making any claims about the PowerStack's output or efficiency. *Id.* at ¶29.

In their roles as CEO and President, Hinds and Goldstein consulted with one another on the content of the press releases. Goldstein was quoted in the November 2017 release and Hinds was quoted in June 2018 release with Goldstein listed as the contact person. Furthermore, Goldstein sent email updates to existing shareholders containing information from the press releases, and they were posted on the Company website. Hinds, Goldstein, and van Arem all collaborated along with others on creating the YouTube video. *Id.* at ¶31.

Thunderbird, Hinds, and Goldstein also made material misrepresentations and omissions regarding the use of investor funds in Thunderbird's offering documents, including in the Company's PPM. The PPM provided that the Company would use specific amounts of investor proceeds for several business-related activities, including design and engineering expenses, wind tunnel and other testing, marketing, licensing, management, administrative, consulting, and lobbying expenses, and patent and other legal expenses. Thunderbird also incorporated this

breakdown in a business plan the Defendants distributed to investors. *Id.* at ¶32.

However, bank records and other documents show Thunderbird did not use investor funds as the Defendants represented. Instead, among other things, they used the money to enrich Hinds and his companies AZ Prep and Motivating Minds, which were unrelated to Thunderbird. They also paid undisclosed commissions to van Arem, Goldstein, and sales agents. Thunderbird and Hinds sent hundreds of thousands of dollars to various accounts controlled by Hinds for AZ Prep and Motivating Minds. Furthermore, Thunderbird and Hinds sent about $945,000 to van Arem, who used at least $570,000 of that money to pay commissions to himself, Goldstein, and sales agents. The Defendants did not disclose those uses of investor money and the commission agreements with van Arem to investors. This unauthorized use of funds constituted misappropriation of investor money. *Id.* at ¶¶33-35.

### C. Thunderbird Violated The Securities Laws

#### 1. Thunderbird Violated Sections 5(a) And (c) Of The Securities Act

Sections 5(a) and (c) of the Securities Act require that every offer and sale of securities must be either registered or validly exempted from registration. 15 U.S.C. § 77e. To establish a prima facie case of a Section 5 violation, the Commission must prove that the defendant, directly or indirectly: (a) offered or sold a security; (b) using interstate commerce; while (c) no registration statement was filed or in effect as to the transaction. *SEC v. Calvo*, 378 F.3d 1211, 1214 (11th Cir. 2004). The Commission is not required to prove intent or scienter. *Id.* Once the Commission has established a prima facie case, the burden shifts to the defendant to show that an exemption or safe harbor from registration is available for the offer or sale of the security. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).

Here the allegations of the Complaint deemed admitted against Thunderbird and the other

supporting evidence demonstrate the Company violated Sections 5(a) and (c) of the Securities Act. Thunderbird offered and sold shares of its common stock to the general public. DE 1 at ¶¶12-18. Thunderbird and the other defendants used the telephone, mail, and email to contact investors, send them documents, tout the Company, and receive funds from investors. *Id.* Thunderbird's own offering materials made clear the Company did not register its offering with the Commission. *Id.* at ¶14.

Thunderbird claimed its offering was exempt from registration under Regulation D, Rule 506(c) of the Securities Act, which required all U.S. investors to be accredited. *Id.* However, the Complaint and other supporting evidence show not all U.S. investors in Thunderbird were accredited, and that Thunderbird did not take reasonable steps to verify that all investors were accredited. *Id.* at ¶¶17-18; Exhibits 1 and 2. Thus, Thunderbird's shares were not exempt from registration under Regulation D, Rule 506(c), and the Company violated Sections 5(a) and (c) of the Securities Act in its offer and sale of shares to investors.

2.  Thunderbird Violated Securities Act Section 17(a) and Exchange Act Section 10(b)

Section 17(a) of the Securities Act prohibits using a fraudulent scheme or conduct, or making material misrepresentations or omissions, in the offer or sale of securities. 15 U.S.C. § 77q(a). Section 10(b) of the Exchange Act and Exchange Act Rule 10-5 prohibit similar misconduct in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful, in connection with the purchase or sale of securities: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business

which operates or would operate as a fraud or deceit upon any person. 17 C.F.R. § 240.10b-5. *See also SEC v. Monterosso*, 756 F.3d 1326, 1333-34 (11th Cir. 2014).

To prove a violation of either statute or Rule 10b-5, the Commission must show: (1) misrepresentations or omissions; (2) that are material; (3) made with scienter or negligently;[2] and (4) use of interstate commerce. *SEC v. Goble*, 682 F.3d 934, 942-43 (11th Cir. 2012); *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019). Here the allegations of the Complaint and the other supporting evidence demonstrate the Commission has proved all four elements.

First, Thunderbird and the other Defendants clearly made misrepresentations and omissions to investors. In the PPM, press releases, and the YouTube video, and on the Company website, Thunderbird misrepresented the testing that Siemens had done on the PowerStack and conclusions Siemens had drawn. DE 1 at ¶¶21-29. Among other things, Thunderbird misrepresented to investors that the PowerStack was not only the most efficient and cost-effective wind turbine technology in the world, but the most cost-effective energy producer *of any kind*. *Id.* Thunderbird further represented that these fantastic statements were not its own conclusions, but those of Siemens. *Id.* Finally, the Defendants misstated in the various documents how Thunderbird would use investor proceeds. *Id.* at ¶¶32-25.

Clearly these statements were false. As the declarations of Ali Rozati (the lead testing manager for Siemens) and Peter Jenkins (the co-inventor of the PowerStack who participated in the testing) make clear, Siemens merely did computer simulations of the technology based on data provided by Thunderbird. *Id.* at ¶¶27-30; Exhibits 3 and 4. Siemens did not compare the PowerStack to any other energy technology on the market, or determine its efficiency or cost-

---

[2] Exchange Act Section 10(b) and Securities Act Section 17(a)(1) require proof of scienter. Violations of Securities Act Sections 17(a)(2) and 17(a)(3) may be established by a showing of negligence. *Aaron v. SEC*, 446 U.S. 680, 697 (1980); *Monterosso*, 756 F.3d at 1334.

effectiveness. DE 1 at ¶¶27-30; Exhibits 3 and 4. There was no factual basis for the statements Thunderbird made in the PPM, the press releases, the YouTube video, or on its website. DE 1 at ¶¶27-30; Exhibits 3 and 4. Similarly, Thunderbird's statements about its use of proceeds were false. The Company did not use investor proceeds as it stated it would in the PPM, and did not tell investors the Company was using funds to pay sales agents and its principals. *Id.* at 32-35.

Second, the false statements and omissions Thunderbird made were material. A stated or omitted fact "is material if there is a substantial likelihood that a reasonable purchaser . . . of a security . . . would consider the fact important in deciding whether to buy or sell the security . . . ." *Goble*, 682 F.3d at 944 (quotation omitted). Thunderbird's statements were plainly material, as any reasonable investor would want to know that the technology he or she was investing in had not been validated through testing as the company promoting the technology represented. *SEC v. Merkin*, No. 11-23585-CIV, 2012 WL 5245561 at *7 (S.D. Fla. Oct. 3, 2012) (facts were "so obviously important to the investor, that reasonable minds cannot differ on the question of materiality"). Likewise, reasonable investors would want to know the seller of securities was misrepresenting how it would use their money. *SEC v. LottoNet Operating Corp.*, No. 17-21033-CIV, 2017 WL 6949289 at *13 (S.D. Fla. Mar. 31, 2017) ("any reasonable investor would want to know how Defendants were really using investor funds and that Defendants were misappropriating investor money").

Third, Thunderbird, through its executives Hinds, Goldstein, and van Arem, acted with scienter. Scienter is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Extreme recklessness also satisfies the scienter requirement. *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (scienter is an "'intent to deceive, manipulate, or defraud' or 'that severe recklessness' in which the 'danger of misleading

11

buyers or sellers is either known to the defendant or so obvious that the defendant must have been aware of it.'"). Proof of recklessness may be inferred from circumstantial evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91 n.30 (1983).

There can be no doubt that Thunderbird, through its executives, knew it was making false statements or at the very least displayed extreme recklessness in the statements the Company made. For example, Goldstein, van Arem and Hinds all knew Thunderbird had hired sales agents to solicit investors and that the Company was using 50 percent of investor proceeds to pay van Arem and the sales agents. DE 1 at ¶¶16, 19. Furthermore, all of them participated in drafting the PPM that did not disclose to investors that Thunderbird was using 50 percent of investor funds to pay sales agents and van Arem. *Id.* at ¶¶12-13 and 33-35. Thus they either knew or were extremely reckless in not knowing that the PPMs omitted disclosing this material information to investors.

Likewise, the three Thunderbird officers were all involved in drafting the press releases and creating the YouTube video that contained the false and misleading statements about Siemens' testing of the PowerStack. *Id.* at ¶31. At a minimum, they acted extremely recklessly when they put out such outlandish statements as the PowerStack was the most cost-effective energy technology of any kind in the world when they knew Thunderbird had not even started building a prototype and had not done any physical wind-tunnel testing. *Id.* at ¶¶27-30; Exhibits 3 and 4.

Fourth, the allegations of the Complaint conclusively establish that Thunderbird "directly and indirectly, made use of the means and instrumentalities of interstate commerce, and the mails, in connections with the acts, practices, and courses of business set forth in this Complaint." DE 1 at ¶11. *See also Id.* at ¶¶16-17. Thus, the uncontested evidence shows Thunderbird violated Section 17(a) of the Securities Act and Exchange Act Section 10(b) and Rule 10b-5.

### 3.  Thunderbird Violated Section 15(a) Of The Exchange Act

The Complaint alleges Thunderbird acted as a broker or dealer in offering and selling its securities without being registered as or associated with a broker or dealer in violation of Section 15(a) of the Exchange Act.  DE 1 at Count VIII.  Factors in determining whether a person or entity acted as a broker include "whether the person: 1) actively solicited investors; 2) advised investors as to the merits of an investment; 3) acted with a 'certain regularity of participation in securities transactions'; and 4) received commissions or transaction-based" compensation.  *SEC v. Corp. Relations Group*, Case No. 6:99-cv-1222, 2003 WL 25570113 at *17 (M.D. Fla. Mar. 28, 2003).  Scienter is not an element of the charge.  *Id.*

Here Thunderbird acted as a broker or dealer in offering or selling its securities when it hired sales agents to solicit investments in its stock, sent potential investors numerous documents promoting the Company such as the PPM, business plan, and the YouTube video, answered investors questions, cold-called investors on its own (through Goldstein and van Arem), received investors' funds, signed investors' subscription agreements, sent investors stock certificates, and put out press releases touting Siemens' testing of the PowerStack.  DE 1 at ¶¶1, 12, 13, 16, 17, 18, 21, 23, and 26.  At a minimum, these allegations of the Complaint demonstrate the first three factors.  Furthermore, Thunderbird controlled a sales force to whom it paid transaction-based compensation.  *Id.* at ¶¶32-35.  *Corporate Relations Group,* WL 25570113 at *17-18 (company liable under Section 15(a)(1) for promoting securities through brokers to whom it paid transaction based compensation).  Accordingly, Thunderbird violated Section 15(a) of the Exchange Act.

### D. Relief Requested

### 1.  The Commission Is Entitled To An Injunction Against Thunderbird

The Commission's Complaint seeks a judgment permanently enjoining Thunderbird from

future violations of Securities Act Sections 5(a) and (c) and 17(a), and Exchange Act Sections 10(b) and 15(a), and Exchange Act Rule 10b-5. The Commission is entitled to injunctive relief when it establishes: (1) a violation of the federal securities laws; and (2) a reasonable likelihood of future violations. *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004). The Commission has already established the first prong by showing Thunderbird violated the federal securities laws. In determining whether a defendant is reasonably likely to continue to violate the securities laws, courts consider: (1) the egregiousness of the defendant's actions; (2) the isolated or recurrent nature of the violations; (3) the degree of scienter involved; (4) the sincerity of the defendant's assurances against future violations; (5) the defendant's recognition of the wrongful nature of his conduct; and (6) the likelihood that the defendant's occupation will present opportunities for future violations. *SEC v. Carriba Air*, Inc., 681 F.2d 1318, 1322 (11th Cir. 1982). Not every factor must be present to warrant entry of an injunction. *SEC v. Murphy*, 626 F.2d 633, 656 (9th Cir. 1980); *SEC v. Smart*, No. 09cv00224, 2011 WL 2297659 at *20 (D. Utah June 8, 2011) ("it is not necessary that the Commission prove the existence of every one of these factors to establish a proper showing and obtain an injunction.").

      Here, all of the factors support the issuance of a permanent injunction. As for the first three factors, Thunderbird engaged in egregious, repetitive behavior involving a high level of scienter. Over more than two years, the Company fraudulently raised almost $2 million from at least 60 investors, repeatedly lying about the Company's intended use of proceeds and the results of testing on its wind turbine technology by Siemens. Furthermore, the Company and its top officers misappropriated a significant portion of investor proceeds for their own use. It is hard to imagine conduct more egregious and engaged in with a higher level of scienter.

      As to the fourth and fifth factors, Thunderbird first defended this lawsuit, as was its right, then

defaulted. In so doing, the Company has never admitted wrongdoing, and has not offered any assurances against future misconduct. With respect to the final factor, although the Commission does not have specific information regarding Thunderbird's future plans, the Commission notes that Thunderbird is still an active corporation in Arizona, and was sending updates to investors as recently as last year. Thus, without an injunction, the Court cannot have any assurances that Thunderbird will avoid future misconduct. As a result, all of the factors weigh in favor of the Court entering a permanent injunction against the Company.

### 2.  Disgorgement, Prejudgment Interest, And A Civil Penalty

With regard to the disgorgement, prejudgment interest, and civil penalty the Complaint seeks against Thunderbird, the Commission asks the Court to give it 90 days from the date of the Judgment to file a motion seeking specific amounts of disgorgement, prejudgment interest, and a civil penalty. The undersigned staff needs to recommend to the Commission and receive approval for the specific amounts we intend to seek. As the remainder of the case is ongoing against Hinds, the 90 days will not result in any delay of the ultimate resolution of the case.

### IV.  Conclusion

For all of the foregoing reasons, the Commission asks the Court to enter the attached proposed Judgment against Thunderbird.

Respectfully submitted,

July ___, 2021

Robert K. Levenson
Senior Trial Counsel
Fla. Bar No. 0089771
Telephone: (305) 982-6341
E-mail: Levensonr@sec.gov

Andrew O. Schiff, Esq.
Regional Trial Counsel
Direct Dial: (305) 982-6390

E-mail: schiffa@sec.gov

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, FL  33131

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July __, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and also served it on Thunderbird Power as identified below.

Thunderbird Power Corporation (via overnight mail)
3961 E. Chandler Blvd.
Suite 111-216
Phoenix, Arizona 85048

Robert K. Levenson, Esq.